## SUPREME COURT.

In the Matter of the Petition of JANE KNAPP, as executrix, &c.

*Attorney and client — Their relations as to compensation — Attorney's charges against executors — Attorney not entitled to charge for his services as a lobbyist.*

It is the duty of the court, in a case where an attorney retains money collected by him, as compensation for professional services rendered and disbursements expended by him, to see to it that while the attorney is protected in his legal rights, and fairly compensated for his services, he does not take the slightest advantage of his particular relations to his

· client, or of the fact that the disputed moneys are in his own hands and may be retained by him under his lien until: his compensation is adjusted.

It must be shown, where the charges are against an executor, not only that they are a fair compensation for such services, but that they were the proper subject of charges against an executor, and were necessary under the circumstances.

Interviews with creditors of the estate and the answering of their inquiries are not the proper basis of a claim against the client of the attorney.

A lawyer has no right, while acting merely as a lobbyist, to ask the court to consider him as entitled to the protection and compensation generally regarded as due to the office of attorney and counselor.

*First Department, General Term, September,* 1880.

APPEAL from order of special term, denying petition for order directing payment of moneys collected, &c.

*John McCrone,* for appellant.

*Ambrose Monell,* for respondent.

DAVIS, *P. J.*—The right of an attorney to retain in his hands moneys collected by him, as compensation for professional services rendered and for disbursements expended by him, is settled (*Bowling Green Savings Bank* agt. *Todd,* 52 *N. Y.,* 489). It is questionable whether it would not have been better for the morale, as it certainly would for the reputation of the profession if it had been otherwise adjudicated. The temptation, where money is already in an attorney's hands, to make his charges square with the total of his debit would not then have existed with the same force, nor would the sarcastic and severely unjust definition of a lawyer, as "one who rescues your estate from your enemy and keeps it himself," have been so often apparently just. No duty to be performed by a court is more delicate and embarrassing than the disposing of controversies between attorneys and their clients in relation to the payment of moneys in the hands of the former, and which are retained and claimed as compensation for services. Clients

Matter of Knapp.

who claim to be aggrieved are apt to, and always do if beaten, suppose that the attorney is favored and protected by the court, while on the other hand, the attorney, if compelled to refund what he believes he has properly applied to his just and reasonable charges, fancies that his professional relations to the courts have induced them to apply to his case harsher rules than govern ordinary litigations. It is the duty, however, of the court in such cases, which are addressed largely to the judicial conscience, to see to it that while the attorney is protected in his legal rights and fairly compensated for his services, he does not take the slightest advantage of his particular relations to his client, or of the fact that the disputed moneys are in his own hands and may be retained under his lien until his compensation is adjusted. He must not be permitted in any case to demand and receive more than his just compensation by operating upon any fear of his client, real or imaginary, that his possession of the funds is a "coign of vantage" from which he cannot easily be dislodged, or through a belief that he can make a contest over the claim more injurious to his client than submission to an inequitable demand. In the case now before us, it is very plain that the attorney rendered much and valuable service to the petitioner and her testator; and evidence was given before the referee by able and honorable lawyers to the effect that the sum retained was no more, in their opinion, than a fair compensation for the services he testified he had rendered. But the witnesses and the referee did not closely look into the nature of the services, with a view to see whether they should all have been, or were, the proper subject of charges against the petitioner ; or whether, although rendered, they were satisfactorily shown to have been necessary under the circumstances. These are questions which we feel bound to consider. Among the items of the account are these: "General professional services rendered the executrix in regard to claims against the estate, and various consultations with her in reference thereto, interviews innumerable with various creditors of the estate, $250. Gen

eral professional services rendered in reference to the claims presented against estate of Knapp, including at least fifty interviews with the different creditors, $200." Succeeding these are numerous charges itemized and specified for services in all the litigations of the petitioner and her testator, in which the respondent seems to have been employed; and for various services outside of the litigation and relating to the estate. In respect to the above charge of $250, the respondent testified: " Mr. Knapp had a very large number of creditors, mostly workmen, who had worked upon buildings where he had contracts, and they had claims against him. They were constantly calling at my office. I got them to present their claims in the proper way, and they kept calling on me to see whether their claims would be paid. These are the services for which I make charge in my bill." And when asked " Did you render these services to Mrs. Knapp?" the answer was " It was rendered in the general course of my business with this claim." "What had this to do with the claim? Nothing, except the creditors were looking after the claim out of which they were to be paid, and they knew that I had it in charge." It is apparent from the testimony that there is no other foundation for the item than the fact that creditors of the estate were running into the respondent's office to inquire how he was getting along with the claim against the city, and his answering their inquiries is substantially those services for which $250 is charged. He was not employed by the executrix to make such answers. If they were the subject of charges, the persons making the inquiries should pay the same; but it seems plain they were nothing more than that kind of incidental annoyance to which every lawyer who is prosecuting claims on behalf of an estate is constantly subjected by creditors who are anxious to ascertain the sources from which payment may be expected. Such inquiries are answered by courtesy, and it requiries some ingenuity to torture them into the basis of a claim against a client of the attorney. It is highly probable that the creditors would have

Matter of Knapp.

refrained from the inquiries if they had supposed each inquiry was diminishing the sum out of which they hoped to receive their pay. I think the referee should have disallowed the item. In reference to the item of $200, there is practically no explanation in the testimony. It looks very much as though it was interposed to swell an apparent aggregate to a sum that would make a gross charge of $4,000 look more reasonable. The referee fixed the value of the services at a gross sum. We cannot distinctly see that he allowed any particular item as charged in the account; but we think it our duty to scrutinize closely such items as seem to have no substantial basis. This charge is also made wholly or in part for answering the casual and frequent inquiries of creditors, and falls, in part at least, within the criticism given to the item of $250.

The portion of the bill for services in suits and litigations and proceedings in the surrogate's court, seem to have been properly allowed.

The bill includes charges for attendance and disbursements at Albany to procure the passage of a general act of the legislature, under which claims of the kind for which suit was brought by the respondent for the testator could be audited by a commissioner, and paid. The charge is for attendance seventy-eighth days at Albany at thirty dollars per day, and for expenses amounting to $661.18. For the most part these services were not professional. They appear from the testimony of the respondent to have been in part services which a lawyer may properly render in appearing before a committee of the legislature, and explaining and advocating the passage of a bill for the benefit of a client; but by far the greater part appears to have been what is commonly called "lobbying," a sort of business which has never received the encomiums of the courts, and never been accepted as within the scope of professional duty or service. A lawyer may do it, it is true, as he may do a great many other things outside of his profession, but he has no right, while acting merely as a lobbyist, to ask

the court to consider him as entitled to the protection and compensation generally regarded as due to the office of attorney and counselor. I think it would have been better to have remanded claims for such services to the consideration of a jury, upon " a *quantum meruit* for work, labor and services," rather than to treat them as claims for the exercise of legal knowledge and skill. It does not satisfactorily appear why it was necessary to harass the legislature *die in diem* for fifty-eight days of a single session to procure the passage of a general act, the merits of which were so apparent, as to receive the recommendation of the chief financial officer of the city. The respondent describes his services in attending the legislature of 1877 as follows: "I was in attendance at Albany every week of the session of the legislature of 1877 for two to four days. I generally went up with the members on Monday and came down with them on Friday when they returned. Q. Now what were the special services that you rendered? A. Were generally done in introducing and procuring the passage of the bill, including various attendances before the committee. Q. What committee? A. In the senate, the committee on cities, and in the house, the judiciary committee. Q. How many arguments did you make before each committee? A. At least three before each committee. Q. How long a time did these arguments occupy? A. Not a very long time; they would not let you speak very long there. Q. What else occupied your time after the arguments were concluded? A. Endeavoring to secure assistance for the passage of the bill; ' * * * talking to the members of the legislature, explaining the bill." There do not appear to have been any improper appliances used to procure the passage of the bill; but it seems strange that such long persistency of effort should have been required for its passage. A lawyer's time, labor and expenses in the line of his profession may be worth forty dollars a day, but this work was not in the line of his profession, so far as it was outside of legitimate arguments before the committees. It seems hard that the

petitioner should be compelled to bear the burden of professional prices for services altogether non-professional in procuring the passage of a general act under which she shares, with many others, benefits common to all. Certainly the respondent should have made known to her what he was doing and charging, and given her some opportunity to decide for herself whether she would employ him in such outside labors at a cost to be measured by professional services in courts of justice. Besides, the services were not authorized by her, and the respondent does not testify that they were. I am of opinion that the referee should have cut down these charges to a more suitable figure. On the whole I am of opinion that at least $1,500 less than the sum reported should have been allowed to the respondent, and that the order should be reversed and an order entered directing the payment to the petitioner of the sum of $1,500, and the costs and disbursements of this appeal.